No. 35,829

E. G. BUSH, *Appellee*, v. WILSON AND COMPANY, *Appellant*.

(138 P. 2d 457)

Opinion filed June 12, 1943.

*W. L. Cunningham,* of Arkansas City, argued the cause, and *D. Arthur Walker* and *William E. Cunningham,* both of Arkansas City, were on the briefs for the appellant.

*George Templar,* of Arkansas City, argued the cause, and *Earle N. Wright,* of Arkansas City, was on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action for wages and attorneys' fees brought pursuant to the federal wage and hour law. Judgment was for the plaintiff. Defendant appeals.

The petition alleged that the defendant was a corporation engaged in buying, processing and selling at wholesale and retail poultry, eggs, cream and other meat and packing products; that it was subject to the laws of Kansas and the provisions of the Fair Labor Standards Act, which was in effect from and after October 24, 1938; that the plaintiff was an employee of the defendant at Arkansas City, Kan., in the capacity of operator and cream buyer, and the number of the employees of the defendant at this point did not ex-

ceed three; that among his other duties he bought, tested and handled poultry, eggs and cream for the defendant from farmers and producers within a radius of thirty-five miles from this point for shipment to Wichita and to various points in Oklahoma, which products were reshipped from Wichita to various other points throughout the state and the United States; that the plaintiff was under the Fair Labor Standards Act. The petition further alleged that from the 24th of October, 1938, until the first day of February, 1939, plaintiff worked for the defendant sixty-three hours a week, for which he was entitled to receive twenty-five cents an hour for the first forty-four hours and thirty-seven and one-half cents for nineteen hours overtime, and that the defendant was indebted to plaintiff in the sum of $253.68 for wages. The petition further stated that each week the defendant paid plaintiff a small commission, the amount of which he was not able to state; that he had demanded the wages due him by virtue of his employment under the Fair Labor Standards Act and that defendant failed to pay him and he was entitled to $253.68 as liquidated damages for the wrongful refusal of the company to pay him his minimum wages. The petition also stated that it had been necessary for plaintiff to employ a lawyer and he was entitled to an allowance of reasonable attorneys' fees in the sum of $250. The prayer was for judgment against defendant in the sum of $757.36.

To this petition the defendant demurred on various grounds, not all of which it will be necessary to notice. Included therein, however, was the allegation that the petition failed to state facts sufficient to bring either plaintiff or defendant within the provisions of the Fair Labor Standards Act of 1938. This demurrer was over-ruled, whereupon the defendant filed a general denial.

The case was submitted to the trial court without a jury. The court made findings of fact and conclusions of law. The findings of fact generally were in favor of the plaintiff and the conclusions of law were that plaintiff was entitled to a judgment in the amount of $196.40 for wages, the same amount for liquidated damages and $300 as a reasonable attorney's fee for the benefit of his attorney.

The defendant filed motions to set aside certain findings of fact and for a new trial. These motions were all overruled and judgment was entered according to the findings. From that judgment the defendant has appealed.

Defendant first argues that the evidence of plaintiff established

that he was not an employee of the defendant but was an independent contractor. Stated another way, the defendant argues that it was necessary for the plaintiff to prove that he was an employee of the defendant and that there was a total absence of any proof of any of the elements necessary to constitute plaintiff an employee of defendant. The act in question is known by the title "The Fair Labor Standards Act of 1938." It appears in Title 29 of the United States Code Annotated, sections 201 to 219 of chapter 8. It covered many phases of the labor problem in the nation. Amongst other things it provided that every employer should pay to each of his employees, who was engaged in commerce or in the production of goods for commerce, twenty-five cents an hour for the first year after the effective date of the act. (See Title 29 U. S. C. A., ch. 8, sec. 206.) The act also provided that any employer who should violate the provisions of section 206 should be liable to the employee in the amount of his unpaid minimum wages and an equal additional amount as liquidated damages and that an action to recover this might be maintained in any court of competent jurisdiction by the employee and that the court in such action should in addition to this allow reasonable attorneys' fees to be paid by the defendant. (See Title 29, U. S. C. A., ch. 8, sec. 216.)

On account of these provisions many actions have been begun in state courts to collect the wages provided, even though the liability is provided by a federal statute. Thus it became necessary for the plaintiff to prove in this action that he had been an employee of the defendant; that he had been paid less than twenty-five cents an hour after the act went into effect and that he was engaged in commerce or the production of goods for commerce.

There is not a very sharp dispute in the evidence. The difference of the parties is rather in the conclusion to be drawn from the various circumstances about which the plaintiff offered testimony.

Plaintiff first went to work for The Western Creamery Company, the rights of which passed later to the defendant, in May, 1933. At this time he and The Western Creamery Company entered into a written contract which by its terms was to be good for only six months. By this contract the creamery company agreed to pay one-half the rent of the location where the station was located, and Bush was to receive a commission of two cents for butterfat received in Wichita. Bush continued to work for the defendant after it succeeded to the rights of The Western Creamery Company but

made no other contract. This written contract was modified from time to time by letters and oral conversations had between the parties, so that finally at the time we are considering the defendant was paying all of the rent, the gas, light and water bills, and was paying plaintiff a commission of a cent a dozen for eggs purchased and a cent a pound for poultry. It was his duty, among other things, to test the cream for butterfat, to candle the eggs and put them in containers and to weigh the chickens and put them in coops, and to put the cream in cans.

Plaintiff bought this produce from farmers who had produced it on farms in and around Arkansas City. He paid for it with checks of Wilson & Company, signed by himself. The defendant had given him the right to draw checks against its account and had caused him to be covered by a fidelity bond. Every few days a truck from the defendant's Wichita plant would come along and he would help the truck driver load the chickens and cream and eggs on the truck. He had the right to sell some of this produce if he called the home office first, and when he did he sent the money in to the company by the truck driver. There was evidence that Wilson & Company owned the cream cans and testing equipment and furnished the mechanical equipment with which plaintiff did business. The equipment consisted of glassware, test bottles, sample bottles, sulphuric acid, water tank, heater and stove, also a battery for the poultry coop, egg cases and an equipment to candle eggs. He paid for this produce whatever Wilson & Company told him to pay. They advised him when there was any change to be made in the price which he could pay. He received instructions several times a week and supervisors would come two or three times a week and instruct him about what he should do. The sign over the place of business said "Wilson & Company," with the words "E. G. Bush" underneath. He worked from seven in the morning until six at night, unless the truck driver would come in after six, then he would stay and help him load out, and on Saturday he worked until nine. Supervisors for defendant had told him what hours to stay open and that he must be sure and stay open on Saturday until the farmers had all finished their trading which was usually by nine o'clock. All together the evidence of plaintiff disclosed that he did do the kind of work that cream-station operators generally do throughout the country.

The defendant reviews this evidence and argues that it disclosed that the contract between plaintiff and defendant was that the plain-

tiff should operate on a commission basis—the more he bought the more he would be paid—and that the interpretation given by the trial court to the contractual relationship between these parties would encourage the plaintiff to sit down and do nothing because he would be paid just the same, whether he bought much or little cream and eggs and poultry.

The question whether a person is an employee of another has received the attention of this court many times. The rules are somewhat different when we are dealing with a workmen's compensation case or a case that involves the unemployment insurance act or a case of the sort that involves the Fair Labor Standards Act, such as we have here. There are some general rules, however, which may be said to apply to all cases generally. One often is known as the "right to control" rule, that is, whether a person is an employee of another depends upon whether the person who is claimed to be an employer has a right to control the manner in which the work is done. It has been pointed out many times that this means not actually the exercise of control, but does mean the right to control. (See *Mendel v. Fort Scott Hydraulic Cement Co.*, 147 Kan. 719, 78 P. 2d 868, and *Schroeder v. American Nat'l Bank*, 154 Kan. 721, 121 P. 2d 186.)

On a demurrer to the evidence it is the duty of this court to take all of the circumstances about which testimony was offered and draw any reasonable inference from them that would uphold the theory of the plaintiff. When we do that we have no trouble at all in reaching the conclusion that there was ample evidence to warrant the court in finding that this defendant did have the right and authority to direct and control the manner in which the work of the plaintiff was carried on.

Of interest in this connection is the holding of this court in *Sims v. Dietrich*, 155 Kan. 310, 124 P. 2d 507. There the rule is set out as follows:

"Following *Houdek v. Gloyd*, 152 Kan. 789, 107 P. 2d 751, it is held: (a) 'A master is a principal who employs another to perform service for him, and who controls or has the right to control the physical conduct of the other in the performance of such service, and the servant is the person so employed.' (Syl. ¶ 2.) (b) 'An independent contractor is generally one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work.' (Syl. ¶ 3.)

"In determining whether one acting for another is a servant or an inde-

pendent contractor, the following matters of fact, among others, are to be considered: (a) whether the employer or the workman supplies the tools used; (b) the length of time for which the person is employed; (c) the method of payment, whether by the time or by the job; (d) whether or not the work is a part of the regular business of the employer." (Syl. ¶¶ 1, 2.)

The trial court did not find in so many words that plaintiff was an employee of defendant, but did find certain facts from which it concluded as a matter of law that plaintiff and defendant were under the statute. This implied a finding that plaintiff was an employee. The defendant attacks these findings generally by proper motions to set them aside, but we have concluded that they are all sustained by substantial evidence and that the trial court did not commit any error in overruling these motions. We should not pass this phase of the case without referring to the provision of the act with reference to what shall constitute an employee. Section 203 of the United States Code Annotated, Title 29, chapter 8, being section 3 of the act, contains various definitions. Subparagraph (e) provides:

" 'Employee' includes any individual employed by employer."

Section 203 (g) provides:

" 'Employ' includes to suffer or permit to work."

This act was intended as a comprehensive regulation of the rate of pay and hours of labor of employees generally in the nation engaged in commerce as defined by the act. The definitions in the statute are couched in such general terms that they are subject to interpretation by the courts. Thus it is proper for this court to look to its own authorities for a definition of the word "employer," and we have no trouble in concluding that as these definitions have been announced many times by us this plaintiff was an employee of defendant even though he was most of the time at the station by himself and even though his pay under the arrangement between the parties depended upon a commission rather than payment by the hour.

Appellant next argues that the plaintiff was not engaged in the production of goods for interstate commerce and hence was not under this act. There was evidence to the effect that the products that the plaintiff bought were shipped by truck to Wichita and handled by Wilson & Company in the usual course of its business. Counsel for the defendant, during the examination of a witness for the defendant, stated that he had admitted in his opening state-

ment that Wilson & Company were engaged in interstate commerce. There does not seem to have been any question but that such was the case. Certainly the question cannot be raised at this time on appeal that the goods bought by plaintiff were not used by the defendant in the regular course of its business.

The next question urged by defendant is that the plaintiff was exempt from the act under its provisions. In that argument it relies on a provision of the statute which provides that certain employees shall not be under the act. This is section 213 of the United States Code Annotated, Title 29. That section provides, in part, as follows:

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect . . . (10) to any individual employed within the area of production (as defined by the administrator), engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products."

Defendant points out that plaintiff was buying his cream and eggs and poultry from farmers around Arkansas City; that hence he was employed within the area of production of the goods he handled and under the terms of the act he was exempt. This sends us first to the examination of the various regulations which the wages and hour division has issued pursuant to authority conferred in the act. Regulation 536, issued under date of November, 1938, provided that "area of production" meant that the products or commodities must come from farms in the immediate locality and the number of employees must not exceed seven. (See Regulation U. S. Department of Labor, Wage and Hour Division, November, 1938, 536-2b.) In December, 1940, the division issued a regulation, 536-2, providing that the term "immediate locality" meant produced within ten miles of the establishment where he was employed and in open country or in a rural community, but provided that "immediate locality" should not include any distance more than ten miles, and "open country" or "rural community" should not include any city or town of 2,500 or greater population. (See Regulation U. S. Department of Labor, December, 1940, 536-2a, d.) In December, 1941, there was another regulation which said that instead of general locality the term "area of production" meant general vicinity. (See Regulation U. S. Department of Labor, Wage and Hour Division, April, 1941, 536-2a.) In June, 1940, the division issued

what is called an Interpretative Bulletin. It covered various phases of this act. This interpretative bulletin held that in order for the exemption set out in the statute to apply to an employee, he must be doing these things for market. The bulletin stated:

"An employee engaged in canning commodities for later recanning by his employer would not be engaged in canning for market and hence would not be exempt."

This bulletin further contained the following paragraph, being paragraph 26 of the Interpretative Bulletin No. 14 of the United States Department of Labor, Wage and Hour Division. Paragraph 26 provides as follows:

"The operations included in this term appear to be those physical operations customarily performed in obtaining agricultural or horticultural commodities from producers' farms, transporting them to and receiving them at the establishment, weighing them or otherwise determining on what basis the producer is to be paid, placing them in the establishment where further operations are to be performed, and delivering the commodities to warehouses. Specifically, these operations include loading the commodities on trucks, wagons, etc., in producers' fields or at concentration points, transporting them to the establishment, receiving and unloading them at the establishment, counting or weighing the commodities, assembling, binning, piling, or stacking them in the establishment, moving them from one place to another in the establishment, moving the bags, boxes, cases, barrels, bales, coops, and other loaded containers to wagons, trucks, railroad cars or other conveyances, and transporting the commodities away from the establishment. Since it makes no difference that the employer does not own the goods being handled, the employees of brokers or commission houses who physically handle the goods may be within the exemption."

The interpretative bulletin of the department is not binding upon this court, but we have always paid considerable attention to operative interpretations. This tends to bring about a uniform application of statutes generally and to cause the machinery of government to operate more smoothly. We are disposed to give the interpretative bulletin considerable weight here. Furthermore, where the defendant seeks to take advantage of the exemption set out in the statute it has the burden of showing that this employee is under the exemption. The statute provided that in order to be exempt the handling must be done for market, and contemplates, as we construe it, that it will reach the market in the raw state in which the employee handles it. Hence the burden was on the defendant to show that the eggs and poultry and cream would reach the market

in the same raw state in which the plaintiff handled them. The record does not disclose but what the defendant made cheese and butter of the cream, killed and packed the chickens and stored or dried the eggs. Under such circumstances, we hold that the work performed by the plaintiff was not handling this produce for market and did not bring him within the exemption provided in this act.

The defendant next argues that there was no competent evidence that plaintiff was entitled to recover any amount under the wage and hour law. Defendant bases that argument on the fact that, as it claims, plaintiff did not testify accurately as to the number of hours he worked for the defendant. The plaintiff did testify that he came to work at seven in the morning and worked until six at night on the days in question unless the truck driver would catch him and drive in after six and then he would stay and help him. On Saturdays he worked until nine p. m. He also testified he received commissions amounting to $36 during the time in question. The trial court found that plaintiff worked at least sixty-three hours per week and that the money he received from defendant would amount to three and one-half cents an hour. There was certainly substantial testimony upon which the court was entitled to make that computation.

We have examined the various motions made by the defendant asking that certain findings of fact and conclusions of law be set aside, and have concluded that they were sustained by the evidence and that the trial court was correct in not setting them aside.

The judgment of the trial court is affirmed.